Good morning, ladies and gentlemen. Our first case for this morning is United States of America v. Shaft Jones, 1535-47. So, Mr. Bonin. Good morning, your honors. May it please the court. This case is about the prosecution stretching, I think, very little evidence to go a very long way. Could you speak louder, please? I can't hear you. Okay. The crux of this case, you know, really the central, really most of the evidence is just the interpretations and some tape-recorded comments by a police informant. Why is that not competent evidence? You know, if a person says, when I say, when I hear the word eggs, I realize in this context somebody's talking about cocaine. Why do we need more than that? Well, one, I think just the severity of what he's being accused of. But that doesn't, what, so if it were a misdemeanor, eggs could mean cocaine and a felony, no? Well, no, but if you look at all the cases, I mean, there's lots of cases where an informant or a detective or a co-conspirator is allowed to testify like this. But in all of them, there's something else that shows, yes, this actually was cocaine or whatever the substance was at the time. Here, it's never confirmed. I mean, we've got the detective, you know, we've got the informant who says it's that, who's being paid by the state. We don't have, I mean, he could come in and, you know, make an arrangement, you know. But here's the problem I have. The whole thing was all set up, and then when they get to the car wash, Jones shows him all this cash in the back seat. Right. With the gun and the rifle and everything. I mean, so it's not just these conversations, some of which are recorded, some are not recorded. But the ones that are not recorded are certainly bolstered by the ones that are recorded and consistent with the conversations there. Well, of course, there's several different phases. And that's not everything, because then when we go to the car and get in the garage, another $315,000. And then after they get the warrants, another $221,000 in these various accounts. I mean, he certainly was carrying a lot of cash. And is that suspicious? Well, like a lot of cash. But it's also legal. $353,000 and an unloaded Colt M4 assault rifle right next to it and several loaded magazines for the rifle with night vision scope. And the loaded pistol in his waistband. Right. You know, those are all legal things. And frankly, if you're carrying that kind of cash, you would probably want to be armed. But it's the whole story. I think that's the thing. It's not that they just sat there in the IHOP and talked about eggs, which maybe if they had gone to their apartment and entertained that afternoon, perhaps you might go your way. It's putting all of these things together. They have this discussion. There is the testimony. They drive rather carefully. They go to the car wash in a rather peculiar way of driving. Jones swerves down the alley. And then the other things that Judge Williams was talking about. So don't we have to look at the whole picture as the jury would? Well, I think it would. Yeah. Does it appear that he's acting suspiciously? Yeah, I think you can reasonably say that. Can you say that beyond a reasonable doubt? That's a tougher question. But can you say that this is cocaine that he is hiding here? It could be another drug. It could be some other crime. It could be something he doesn't want his wife to know about. Well, there's a transaction that's going to take place. Surely you would let the jury infer from the fact that $353,000 plus is in the car that he's planning on buying something. Well, something, but the only thing that says it's cocaine. I'm just taking it a step at a time, right? So first he has this kind of strange conversation. I don't know who goes around talking about 20 eggs. I mean, that's like a lot of eggs. Especially for $300,000. Yeah, exactly. I don't think he actually says that number in the, I don't know, maybe he does. I think there is a reference to 20 eggs at some point. I mean, that's 20 omelets. The CS offered to bring, this is page 10 of your brief, toward the bottom of the page, about six lines up. The CS offered to bring, quote, 20 eggs, close quote, but Jones responded, no, no, I'll just come and talk. So that's where I got the number from. And then the December 5th recorded call, Martina says he'll bring 20 eggs to make omelets. So surely that's not what the $300,000 was for. I'm not quite following the question. Omelets, I mean to make omelets. Well, certainly it's not, yeah, certainly it's not actually omelets. But what omelets means, the only thing that says it's cocaine is the police informant, who has never seen Shaft Jones purchase drugs from somebody else. But why can't the jury credit that testimony? Surely it was aware that maybe there was a reason not to, but it chose to credit it, apparently. Well, I think you need some sort of corroboration. Why? In all the other cases, it's there. They find drugs once they arrest them. I don't know where you're getting the corroboration rule from, though. Well, you know, I was not able to find a case where it said there must be corroboration. But it's something that's in all the cases. And in almost all of them, I think in just about every case that's cited by either party, you know, it describes, okay, the informant said this, or, you know, whoever it was was an interpreter. And there's plenty of evidence to corroborate this, because, you know, they found, you know, on such and such a day, he said, oh, I'm going to deliver, you know, eggs or whatever it was. And someone was arrested with that quantity of, you know, drugs at that time. Or they find a cache of drugs once they find them. Or they've got a co-conspirator who says, yes, I've been selling drugs to him or buying drugs from him and so forth. I mean, that's part of this, too, is this is supposed to be a very large drug operation. And the prosecution did not find any regular accomplices. They didn't find any drugs. You know, there's no real evidence of a distribution operation. It's all based on this informant. And he shows up with, you know, questionable but legal things. I mean, you know, I certainly don't walk around with, you know, $300,000 in my car. And another $315,000 in another car and et cetera. Close to a million dollars floating around here. Yeah, there is a lot of money in there. Yeah, now there is also evidence that he is a boxing promoter, which I would think would be a cash business. That he's a what? Huh? A boxing promoter? Yeah, there's a number. There's a number of references to that in the record. It's mentioned at sentencing. At the IHOP, he introduces one of the brokers had been a, he had trained him as a boxer. You know, that sort of thing. So, I mean, there is, it wasn't maybe emphasized as much as I would have liked a trial. But, yeah. So let me ask you, if you wouldn't mind, to turn to your challenge to the sentence, to the relevant conduct counting. Because the government suggests that there are two ways you could get there. One, through Martinez's testimony that there had been the 90-kilogram deal, I gather, spread a bit over time, but essentially 90-kilogram deal. And if that's okay, then there's nothing to say about this sentencing range. Then there's the other possibility of taking the amount of money and reasoning backwards for what that would convert to. But even if that's flawed, why isn't the 90 kilograms enough by itself? And have you really preserved that objection? Well, both of them really are the same thing. I mean, both of them are looking back. I don't think so. They're completely different approaches. Well, they're both looking back at, well, he's been dealing for a long time. And whether it's the statement by the informant that says, oh, Jones told me that he bought 90 kilograms from the other guy. Or whether it's imputing all this money he had. Either way, the argument is that he's been dealing drugs for a long time.  But it's proven in very different ways. It's proven in two different ways. Nobody says the money could account for 90 kilograms. And, indeed, one of your arguments is that the money can't even account for 50, or whatever the number was doesn't get you over 50. But if the 90 is in there, then you're fine. The problem with both ways of getting there is that there's no evidence of a conspiracy prior to this one deal. The hook that they try to use is that, well, this broker who set up this deal also set up the last deal. But there was more evidence, too. Jones told the informant he'd previously acquired 90 keys from brokers. Then Jones tells the informant he'd been in business 26 years without prison time. He's, like, bragging about it. And then Jones tells his cellmate he never messed with anything under $100,000 in cash. The broker is telling the informant that Jones always paid on time, and the search is that revealed all the cash. So there's ---- Well, the thing is, though, the court can't just use, oh, he was dealing drugs. There has to be sufficient connection to this one. It has to be part of the same related conspiracy. I'm trying to remember what the ---- Well, it's the same course of conduct or a common scheme or plan. So that's phrased in the alternative. But why isn't this? This is from Jones's own mouth. You hear, hey, I've been doing this for 26 years. It's really all my business. Well, we don't know it was part of the same plan. The only evidence that suggests ---- Well, what do you think the same plan means if it's not this? Well, the cases say it needs to be, you know, you're planning in the same area, maybe using the same people, you know, those sorts of things. Now, maybe he was, but we don't really know that. And, in fact, one significant thing there is that, you know, the informant claims that Jones's big complaint about the other guy was he could only supply like five kilograms at a time, and it wasn't good enough for him to cook. Doesn't he comment that he did this 90-kilogram deal through a supplier he met through these brokers? That's the, I think, I'm trying to remember, I think it was the informant said that Shaft said that. Did you or his lawyer in the district court challenge any of the conditions of supervised release? I don't recall. I wasn't involved at the trial. I don't, not that I recall. Let me ask you, something struck me as peculiar in your brief that the trial lawyer waived an entrapment defense, thus reserving it for post-conviction proceedings? What does that mean? If a lawyer overlooks something, you automatically get another trial? What's that about? Well, what I meant by that was... It's over, with rare exceptions. Why, if you haven't pleaded entrapment, do you get a chance at post-conviction remedies? Well, he could potentially claim ineffective assistance of counsel. Claim what? He could potentially claim ineffective assistance of counsel at that stage. So you're essentially saying you're not trying to raise an ineffective assistance of counsel argument right now. Right. Because Massaro and other cases say you should wait, and one of the grounds might be the failure to preserve the entrapment defense. Right. You didn't say that, though. No, no, the brief doesn't quite say that. But if that's where you were going... Yeah, that's all I meant. And frankly, I put it in because my client's very concerned about that, and I wanted to note that, I guess, for him. So your notion is this $300,000-plus was for boxing promotion? It could have been something else illegal. What are you talking about? It's extremely unusual for people to be walking around with $300,000 in cash. True, but, I mean, the thing is he was charged with... You ever seen that before? Yeah, when people carry that much money, they usually don't show it to you, so I don't really know. I mean, it comes up in these cases, but... Cash is actually disappearing, so it's, I suppose, becoming ever more uncommon for somebody to have that much in the way of cash. Young people don't use cash at all. And the other thing is, you know, although it was a lot of cash, it was not enough to complete the transaction. But then let's look at his London Lane home where they got a warrant, $6,000 in cash, two handguns, a stun gun, a digital scale, a bulletproof vest, a money counter, and in the garage $315,000 in cash. Well, and if he was on his way to actually complete the transaction, I guess we're now talking about the attempt charge primarily, he would have had some of the... I mean, he could have brought enough cash along to complete the transaction. He didn't. He had this bulletproof vest, which you would think if you were... You know, the first deal with the new drug supplier for that quantity, you'd think you'd want to come as prepared as you could. I mean, if you got a bulletproof vest, this would be the time to wear it. You'd think you'd... Why do you say that there wasn't enough money to complete the transaction? Because the amount that the informant said was due at that point was greater than the amount that was found. Yes, but do you think someone who's selling or buying drugs is going to fuss about the extra few thousand dollars when he sees a chance of getting $313,000? What sense would that make? Oh, I'm sorry. I don't want your $313,000. I want $340,000. I would think that that would... Yeah, I don't know how a drug dealer would react. What's the use of common sense about it? It doesn't make sense. You don't give away this bird in the hand and $313,000 in the hope that you might get another $20,000. Well, let's put it this way. If a client is supposed to show up with a $10,000 retainer and he shows up with $9,000, you know, it depends on the situation. Well, I mean, it's different amounts, right? If he shows up with $313,000 and you want $320,000, don't you think you can negotiate that? Maybe you can. Maybe you can't. Maybe you get shot because he thinks you're trying to rip him off. I don't know. Or maybe you just give a little less cocaine to fit the amount of money that was brought. Who knows? But the evidence is supposed to be that we've got this deal, he's going to pay this much, we're going to give him this much, and Jones doesn't have that a lot. Yeah, see, maybe if he came with $13,000 and the bill was over $300,000, there might be more strength to your argument, but that's not what our situation is. Well, he's got to make, you know. He's short. There's no doubt about that. He needs some more negotiation of some sort if he's going to make this work. And he certainly could have brought that along if he wanted to. And I see him cutting in there. Yeah, you can save the rest of your time if you like. Mr. Holler. Good morning, Your Honors, and may it please the Court. Sufficient evidence does support each of Jones' convictions in this case, and there have been a great number of discussions back and forth, reasoning, thinking about today, thinking about the informant's testimony and whether it makes sense or not. And frankly, Your Honor, those are conversations that probably were had in a jury room in August of 2014 in Fort Wayne, Indiana, which is where these arguments should have been made and were made, and they were resolved. And if the jury had resolved them in Mr. Jones' favor, we would not be here. So could I ask you about the brokers? This is a three-count indictment. Count one's a conspiracy count, so I'm not worrying about the attempt or firearm count right now. You have to have the brokers as still part of this transaction, don't you, to get a conspiracy count? Because you can't conspire with the governments. You can't conspire with Martinez, right? I believe that they were still part of the transaction, although I don't know that they had to have remained part of the transaction. As long as there's an agreement to further the deal, whether or not that ever goes forward, that is alone sufficient to establish a conspiracy conviction. An agreement with whom? Between the brokers and Jones. And that was the only argument that was ever raised at trial, Judge Wood, was that the brokers, and really mainly Serrato Diaz, because Pisano-Guzman's kind of along for the ride. He's the one who's the blabbermouth, the other guy? The blabbermouth was Pisano-Guzman. Serrato Diaz, who's known as Tony also in the record, is the one who's clearly very close to Jones, and he's the one who's Jones' broker, who he's worked with before, who's gotten him 90 kilograms before, and who is involved in the deal. In my opinion, Your Honor, he does stay in the deal, and there's certainly evidence. If you look at Government Appendix 40, this is the discussion, the day of the transaction before they meet, and he says, you know, I want them to still make a little. I just am worried that Pisano-Guzman is a blabbermouth, and so I don't want them physically present at the deal. I want us to deal one-on-one. But, you know, he even says there... This is where I was going to let them do the five or something? Yes. Yeah, they're still talking about how they're going to do the five, because what I was going to do, I was going to let them, you know, do the five, then just, you know, give them the opportunity to make a little. And Martinez responds, yeah, I'm still going to take care of them, but you didn't want them in there making too much noise. So from that alone, the jury could infer he's not cut them out of the deal as far as, I'm no longer working with them. But as we pointed out as well, Your Honor, this deal happened because of that. They were a part of the deal, and if at the end of the day they get screwed out of their share of the money, that doesn't mean that there wasn't a conspiracy and a handshake agreement between Cerrado-Diaz and Jones. If Cerrado-Diaz and Jones had an agreement that said Cerrado-Diaz is going to go out and is going to go and get... find a big-time drug supplier for Jones, the fact that at the end of the day, as sometimes happens in the drug business, Cerrado-Diaz doesn't get his money, that's for Cerrado-Diaz and Jones to work out later. That doesn't mean they didn't conspire and they didn't agree to commit a federal crime. They certainly did. And again, that comes from... and I agree with Mr. Bonet that most of the evidence in this case does come from Martinez. And where exactly are we... do we actually see the word cocaine in the testimony? Well, the police... there's no evidence... they never, as Martinez says, they never say anything on the tapes about cocaine. But if you look, you can see... I mean, just read Martinez's testimony. Martinez testifies that he held himself out as a cocaine dealer. Martinez says on page 391 of the transcript that Cerrado-Diaz, quote, they were looking for a major drug supplier for two different clients. And in fact, and I didn't... we didn't get into this very much in the brief, but the first client was another guy named Reynolds and they'd set up a deal and met with him and he was agreeing to be involved with cocaine. Martinez says, I held myself out as a cocaine dealer and held myself out as a boxing promoter and held myself out as a meth dealer. I held myself out as a cocaine dealer. And they're talking about cooking eggs into omelets. I mean, I think everyone on the court's had enough of these drug cases. You know, you cook powder cocaine into crack cocaine. That's a very common thing to say. And the jurors could, listening to Martinez and listening as well to the agent who gave some brief interpretation testimony that's been allowed by this court, the jury could listen to that and could say, yeah, they're not talking about going to buy two dozen eggs or short of two dozen eggs. They're talking about buying 20 kilograms of cocaine. He took more than sufficient steps to further the deal. We acknowledge he didn't have 100% of the money, but all of the reasons that the court has already set forth I think pretty clearly show he had almost enough. At the end of the day, I do think, yes, one or two things would have happened. They would have just called it even, said we're going to start in a long deal transaction. We'll make it up on the back end. That frequently happens. Or if Martinez had stood his ground and said, you know, you said 390, I'm holding back two or three kilograms, that could have happened too. We only had to prove that he was conspiring with intent to possess five. And here he was trying to get 20. So if two or three got held back, that wouldn't affect the conviction in any way. On a different note, why did the government use a recording device that it knew was faulty? I'm just curious. The only reason we knew that it was faulty, Your Honor, was we knew that it recorded an incorrect date frequently. That's the only part of it that we knew was faulty. We did not know that it was going to run out as far as the time. The batteries died out. And this deal took a longer time, the meeting took a longer time to develop because Jones went to the wrong place or Martinez went, somebody went to the wrong place. There were two IHOPs? There were two different IHOPs. And as I guess happens when you have two big drug dealers, they kind of got in a little bit of a standoff about who's more powerful and who's going to move or not. So that added like over an hour, I believe, to the time. And why did they, I mean, well, we shouldn't use one with the incorrect date, but it's not as easy in the government sometimes to get equipment as quickly as you want. And I don't know that I can say anything else about that. All right. I was just curious. That's just an issue we have.  and we had a car from Chicago ready and waiting. It didn't happen and we sent it back to Chicago. We don't have these trap cars sitting around everywhere. We couldn't get it back in time to do the deal in Fort Wayne, Indiana. I don't know. I don't think we, those are the only answers I can say about that. On the sensing issue, Your Honors. And just to be clear, because I hadn't even thought about this until you were saying, I was sitting here reflecting, these would be very tough omelets if they were actually the equivalent of crack cocaine. But this was sentenced as a powder case. Is that right? Yes, Your Honor. This was sentenced as powder cocaine, not as crack cocaine. All right. Yes. And on that, Your Honor, we believe that the court's precedents are clear. Purim, I think, is the closest case on point where it specifically says common accomplices is enough. And twice in the record, at pages 410 and 11, and again at 476, the defendant reiterates that Jones told me he's gotten through Serrato Diaz, through this same broker before, 90 kilograms, no more than five at a time. That's why he wants me, because I can get him 20 at a time. And that is evidence that it's part of the same course, part of the same conspiracy. So you don't have to get in. We think the math works, and we think that the district court didn't make unfair inferences. So I wondered about the, I mean, you've got the testimony about the 90. Okay. I get that. But if you're going to use the money, how can you use the 353,000 that he's got with him for increasing relevant conduct, since that's actually already money that's dedicated to the 20 that he's going to buy? Aren't you using it twice? I don't think we are, Your Honor. I think the idea was, this is all of this money, this cash, is money that has come from prior drug sales. So he's previously sold, this is his current pool of money that is drugs. The money, and there was testimony about it. So there's sort of a retrospective prospective quality to your argument? Well, right. Eventually he would have gotten. Because he's going to use that money to get the 20. And so it seemed to me that you could only use it once. I guess I disagree with that. That wasn't raised in the district court, Your Honor. And I think the idea was every dollar out of this 890, or I think the district court made some discount and said, even if we took a certain portion away, came from drugs. I mean, the $353,000, there was testimony. This was his smallest bills. These were all ones and all the fives and all the money you want to get rid of. The, the hundreds and the fifties were mostly were in the car. We're in the, in the car, in the garage. So he's trying to get rid of, as drug dealers do, they try to get rid of the smaller bills because they take up more space and are worthless. So I think there's pretty strong evidence that that was money that came from the sale of drugs. Ultimately, Your Honor, though, we don't think it makes any difference because at minimum, what it shows is when, when the defendant is saying, Hey, I've gotten 90 kilograms before the fact that he's got thousands and thousands of dollars in cash. That tends to lay credence to that, that this isn't just him puffing and lying to the agent, try or to the informant trying for the first time in his life to buy drugs. Did the government introduce evidence that there was no other obvious source from which this money could have come? Or we did enter. We did introduce some evidence of that at the sentencing that yes, there was no obvious additional sign of, of, of evidence we offered to introduce his, his tax returns. We needed to get a quarter for that. The district court said she didn't feel that she needed it because she felt that there was enough sufficient evidence from his own statements. He's been doing this for 26 years and the lack of additional evidence, um, that there was anything of that nature. I think Your Honor, especially because the threshold quantity is 50 and he said he's previously bought 90 plus we can add in the 20. So he's at one 10. He's, he's double what he needs to be that even if there's some minimal puffing or something going on here, and that doesn't even include any other suppliers. He's had any other drug dealing he's done in the Fort Wayne community over those 26 years, uh, which he's really like a big time middle man. It sounds like, uh, he was, yeah, I believe he may be the second largest drug dealer we've ever, uh, prosecuted in the Fort Wayne area. And Fort Wayne's a pretty, uh, uh, is a hub for a lot of, of drug dealing at the intersection of, uh, the toll road and interstate 69. So it connects Chicago to Cleveland and Detroit to Indianapolis. So it's, it is a hub area. Uh, so yeah, this was, this, this was a big time drug dealer, very careful drug dealer. And I mean, the defendant wants to say, well, you know, he would have had all these people around him, but drug dealers are careful. They're secretive. Then, and there may have been other people involved who just weren't present, but the more you keep things close to the vest and the higher up you are, and you can do that. He was careful and he, he trusted the wrong guy here and we were, we were fortunate. But, uh, for all those reasons, your honor, we, we see no, um, no evidentiary issues, no sentencing issues. And there was more than sufficient evidence to convict. Uh, we would ask that the judgment be affirmed. All right. Thank you very much. Anything further, Mr, uh, Bonet? Okay. Um, yeah, I think that raises, you know, the,   Please remember to speak up. Oh, sorry. Um, I, I, I, I, I, I, I, I, I, I,           I,    I, I, I, I, I, I, I, I, I do not see why, uh, Ms. Liquor, Ms. we basically working for, uh, Martinez. And all we really know about, why אל Well for Martinez, they say he's working for for Jones. That's a big difference. I realize you're arguing that he's working at the Martinez end. I think the evidence that they're working for Jones is very sketchy. Now do they have a prior relationship with Jones? Yeah, I mean. menitchins he and the one guy to be a boxer. And, um, you know, I mean, they knew about him. They made the arrangement. I think you need more than that to be a conspirator. Uh, you look at the, you know, the broker cases, they're almost all against the broker. And almost all of them are conspiring with, you know, the brokers conspiring with the sellers. I mean, that's just the way, I mean, not just drugs, but almost anything works. You work for the guy above you. Okay. Um, I see I'm out of time, so thank you. Alright, so thank you very much. Thanks as well to the government. We'll take the case under advisement.